IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SANFORD L. HUTTO, #085287        :

    Plaintiff,                  :

vs.                              :    CIVIL ACTION 04-0522-WS-M

DR. ROBERT BARNES, et al.,       :

    Defendants.                 :


<u>REPORT AND RECOMMENDATION</u>

    This is an action under 42 U.S.C. § 1983 by an Alabama
prison inmate, proceeding *pro se* and *in forma pauperis*, which has
been referred for report and recommendation pursuant to 28 U.S.C.
§ 636(b)(1)(B) and Local Rule 72.2(c)(4).  Plaintiff claims that
Defendant Robert Barnes, M.D., Defendant Nurse Practitioner Julie
Gordon, and Defendant Nurse Elizabeth Dell Lee denied him
appropriate medical care while he was incarcerated at the
Fountain Correctional Facility in Atmore, Alabama.  (Doc. 1 at 4-
8; doc. 2 at 1-3; doc. 12 at 2-11; doc. 25 at 18-33; doc. 28 at
4-11; doc. 36 at 5-14; doc. 43 at 2-12 and doc. 61 at 2-10).
Plaintiff alleges that the actions of Defendants Barnes, Gordon
and Lee violated the Eighth Amendment prohibition against cruel
and unusual punishment, and as relief, Plaintiff seeks
declaratory judgment, injunctive relief, compensatory damages in
the amount of $100,000 jointly and severally against all three
Defendants, and punitive damages in the amount of $25,000 against
each Defendant.  (*Id.* at 4-9; doc. 12 at 13-14).

Defendants Barnes, Gordon and Lee filed an answer (Doc. 18) on November 5, 2004, and a special report (Doc. 24) on November 17, 2004, denying that they violated Plaintiff's constitutional rights and contending that Plaintiff has failed to state a claim. Additionally, Defendants have asserted numerous affirmative defenses including, in part, lack of subject matter jurisdiction, respondeat superior, qualified immunity, sovereign immunity, absolute immunity, discretionary function immunity, state agent immunity, and good faith qualified immunity.  (Doc. 18). Defendants also assert that Plaintiff has failed to plead his claims with sufficient specificity, failed to comply with the requirements of the Prison Litigation Reform Act,[1] failed to mitigate his damages, was contributorily negligent, and assumed the risk.  Plaintiff filed an objection to Defendants' answer and special report on November 30, 2004, reiterating his original claims.  (Doc. 25).  Plaintiff also filed an amended complaint which this Court accepted on January 25, 2005.  (Doc. 28).  In response, Defendants filed another answer (Doc. 29) and a supplemental special report (Doc. 30) on February 10, 2005.

Subsequently, on March 1, 2005, Plaintiff filed his own

---

[1]Defendants contend that Plaintiff's claim is barred because he failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act.  However, Defendants have failed to put forth any evidence of a state grievance procedure available for Alabama prisoners, as well as any evidence of Plaintiff's failure to comply with such procedure.

2

affidavit, along with objections to Defendants' answer and special report. (Docs. 34, 35 and 36). Plaintiff later filed a motion to amend his affidavit, along with the amended affidavit on September 7, 2005. (Doc. 43). On October 3, 2005, this Court entered an Order converting Defendants' special report and answer to a motion for summary judgment. (Doc. 47). Plaintiff filed a response in opposition to Defendants' motion for summary judgment on October 24, 2005. (Doc. 49). Thereafter, on November 16, 2005, this Court ordered Defendants to file supplemental affidavits by November 30, 2005, setting out the medical treatment offered or given to Plaintiff for the claims made in his complaint and amended complaint. (Doc. 53). On December 15, 2005, Defendant Barnes filed his second supplemental affidavit as ordered by this Court. (Doc. 56). Plaintiff filed responses to Defendant Barnes' second supplemental affidavit on January 4, 2006, and on February 15, 2006. (Docs. 57 and 61). On February 16, 2006, this Court ordered Defendants to file a response to Plaintiff's "Response to Defendant's Second Supplemental Affidavit of Robert Barnes, M.D.," (Doc. 62), and Defendants complied with this Order on March 17, 2006. (Doc. 67). In accordance with the Court's Order, Defendants' motion for summary judgment was taken under submission following Defendants' response to Plaintiff's "Response to Defendant's Second Supplemental Affidavit of Robert Barnes, M.D." on March 17, 2006.

After consideration by the Court, it is recommended that Defendants' motion for summary judgment be granted, that this action be dismissed with prejudice, and that judgment be entered in favor of Defendants Robert Barnes, M.D., Nurse Practitioner Julie Gordon, and Nurse Elizabeth Dell Lee and against Plaintiff Sanford L. Hutto on all claims.

<u>I. FACTS</u>

During the period of time from February 20, 2004, until the time of the filing of this action, while incarcerated at Fountain Correctional Facility ("Fountain"), Plaintiff claims that he was denied appropriate medical care by Defendants' failure to ensure proper and prompt medical attention, failure to ensure accurate dispensing of his medications, and failure to promptly conduct appropriate medical tests.  (Doc. 1 at 4-7; doc. 2 at 1-3; doc. 25 at 13-31; doc. 28 at 4-11; doc. 35 at 2, 12-18; doc. 36 at 5-14; doc. 43 at 2-12; and doc. 61 at 2-10).  In this action, Plaintiff complains generally of inadequate medical care of his vision problems, numbness in his right arm, and high blood pressure.

Plaintiff claims specifically that he began to lose his eyesight on the day of February 20, 2004, and that he begged to see a prison doctor but was ignored.  (Doc. 2 at 1-2; doc. 25 at 18).  Plaintiff contends that through the help of his sister, Warden Terrell was notified, and that the warden instructed the

4

prison medical staff to make him an appointment with an eye doctor in Montgomery, Alabama.  (Doc. 2 at 1-2; doc. 25 at 18-22).  At approximately this same time, Plaintiff also began experiencing numbness in his right arm and hand, and he visited the prison medical center regularly.  (*Id.*).  On February 21, 2004, Nurse Johnson took Plaintiff's blood pressure, and, upon determining that it was high, administered to him a dose of the medication Catapres.[2]  (Doc. 25 at 18-22).  Thereafter, during the period of time from this visit on February 21, 2004, through March 1, 2004, when Plaintiff was taken to Montgomery for medical care, Plaintiff was seen and treated in the prison medical center nearly every day.  (Doc. 25 at 18-22).  According to Plaintiff, this treatment included examinations, blood pressure checks, medication and an EKG.  (Doc. 25 at 18-22).  On February 26, 2004, Plaintiff claims that he advised the medical staff that he was losing his eyesight, and then, despite being "totally blind," he was able to see to return to his dorm.  (Doc. 25 at 20).

On March 1, 2004, Plaintiff was examined by Montgomery eye doctor, C.E. Jones, who advised Plaintiff that his eyesight could

---

[2]Plaintiff also makes the claim that he is allergic to the medication Catapres.  However, Plaintiff fails to offer any support other than his own personal opinion of this allergy.  Further, a review of Plaintiff's medical records reveals that Plaintiff never complained to the medical staff of negative side effects of Catapres, and in fact, he actually requested that specific drug on numerous occasions to aid in lowering his blood pressure.  (Doc. 24, ex. A at 80 and 90).

5

have been affected by a mild stroke or some type of disease. (Doc. 25 at 22). Dr. Jones recommended several blood tests, an MRI, and a follow up examination. (*Id.*). Subsequently, Dr. Barnes examined Plaintiff at the prison medical center on March 4, 2004, and ordered several blood tests to be taken. (Doc. 25 at 22). These tests were administered on March 8 and 9, 2004, with Dr. Barnes following up with Plaintiff a couple of days later. (*Id.*). According to Plaintiff, Dr. Barnes advised Plaintiff that his "blood count" was up and that he had consulted Dr. Jones regarding Plaintiff's condition. (*Id.*). Dr. Barnes then ordered an additional blood test to be taken the following day. (*Id.*).

On March 16, 2004, when Plaintiff was screened for sick call, he complained that his right arm was numb from the elbow to the fingertips, and that the pain was unbearable. (Doc. 25 at 23). According to Plaintiff, the nurse advised him that she would show his file to the doctor on the next day and see if he ordered anything. (*Id.*). On March 18, 2004, Plaintiff went to pill call and was given the medication Feldene, although Plaintiff later discovered that he should have only been given aspirin. (*Id.*). Plaintiff claims that the nurses confused his chart with another inmate's chart and thus gave him doses of that inmate's medication on March 18, and 19, 2004. (Doc. 25 at 23).

On April 1, 2004, Plaintiff had an appointment with Dr.

Barnes, and he claims that he advised Dr. Barnes that he had gone
blind a month before. (Doc. 25 at 24). Dr. Barnes told
Plaintiff that he would schedule an MRI and also a followup visit
to the Montgomery eye doctor. (*Id.*). Subsequently, on April 5,
2004, Plaintiff's sister called a Captain Patterson requesting
medical help for Plaintiff. Plaintiff was taken to Atmore
Hospital on April 6, 2004, where he underwent a CAT scan. (Doc.
25 at 24). Shortly thereafter, on April 24, 2004, Plaintiff
spent the night in the prison hospital as a result of his high
blood pressure. (Doc. 25 at 25). On April 27, 2004, Plaintiff
met with Defendant Lee regarding his complaints of inadequate
medical care. (Doc. 25 at 27). According to Plaintiff,
Defendant Lee advised him that the reason he lost his eyesight
was a problem with cataracts, and that because Plaintiff's CAT
scan was normal, she did not really know what was wrong with
Plaintiff. (Doc. 25 at 27). She did schedule Plaintiff to see
the prison eye doctor on his next visit. (*Id.*).

Plaintiff claims that on June 25, 2004, Plaintiff saw Dr.
Barnes who allegedly advised Plaintiff that he may be allergic to
Catapres.[3] (Doc. 25 at 26). Plaintiff also complains that Dr.

---

[3]Plaintiff claims that on one occasion when he received the
medication Catapres, he awoke during the night unable to breathe
well and sweating. (Doc. 25 at 28). After using his albuterol
spray, Plaintiff claims that he was able to breathe again.
Plaintiff explains that following this episode, his sisters came
to visit him and at his request, they contacted Dr. Jim Corbett,
the facility's psychologist. (Doc. 25 at 28-29). Plaintiff was

Barnes admitted that he did not know what is wrong with Plaintiff. (*Id.*). On July 21, 2004, Plaintiff remained overnight in the prison medical center because his blood pressure was high. (Doc. 25 at 26-27). Plaintiff had to have an officer retrieve his blood pressure medication from his dorm because the hospital unit was out of the medication. (*Id.*). Plaintiff complains that he would have been better off in his own room on this occasion. (*Id.* at 27).

On December 22, 2004, Plaintiff was examined by Mobile neurologist Dr. Todd Elmore, who diagnosed Plaintiff with arthritis and a pinched nerve in his neck. (Doc. 36 at 8). Dr. Elmore advised Plaintiff to have a temple biopsy and to take steroids. (*Id.*). When Plaintiff returned to the prison, he was advised by Dr. Barnes that the temple biopsy would be performed right away. (*Id.* at 8-9). On December 29, 2004, Plaintiff underwent an MRI at the Atmore Community Hospital. (Doc. 36 at 9). On February 19, 2005, Plaintiff underwent a temple biopsy at North Baldwin Hospital performed by Dr. Ray Gandy. (Doc. 43 at 2). Upon Plaintiff's return to prison, Dr. Barnes began Plaintiff on the medication Prednisone. (*Id.* at 3). Subsequently, on March 2, 2005, Dr. Barnes advised Plaintiff that

---

able to speak to Dr. Corbett and advised him of the problem that he believed he had with the Catapres. Plaintiff alleges that Dr. Corbett then took Plaintiff to speak with the warden, and Plaintiff requested that it be noted in his medical records that he is allergic to Catapres.

the biopsy report indicated that everything was normal.  However, now, according to Plaintiff, Dr. Barnes did not know what was wrong with Plaintiff.  (*Id.*).

The Court notes that Plaintiff has filed numerous lengthy pleadings offering many alleged facts concerning his health and the care he has received while at Fountain, and the Court will not attempt to recite all of these facts.  In general, Plaintiff has made various assertions of inadequate or negligent health care.  He complains that losing his eyesight in prison has been frightening and painful.  Plaintiff contends that his poor eyesight, along with his high blood pressure and right arm numbness, have not been adequately treated while he has been at Fountain.  In particular, Plaintiff complains that Dr. Barnes told him on four occasions that he did not know what was wrong with him.  (Doc. 35 at 15).  Notably, Plaintiff states the following: "[t]he Medical Director Doctor Robert Barnes, M.D. dus [sic] try to do a good jobe [sic] but he has incompetent people working under him, and don't know halft [sic] the time what they are doing."  (Doc. 25 at 15).  Plaintiff asserts that on occasion he was not given prescribed medication because the prison did not have the medication in stock.  (Doc. 25 at 27).  Further, Plaintiff contends that he was not given appropriate tests and follow up appointments.  Plaintiff alleges that while Defendants have given him care, they have been negligent in doing so.  (Doc.

9

35 at 16).

According to Defendants, while incarcerated at Fountain,
Plaintiff has been seen and evaluated by the medical or nursing
staff, and has been referred to appropriate care providers and
given appropriate care, each time he registered any health
complaint at Fountain. (Doc. 24 at 2). Plaintiff has a medical
history that is significant for neurological disturbances
including sporadic episodes of blurred or spotted vision as well
as sporadic numbness in his lower arms and hands. (Doc. 56 at
2). His history is also significant for high blood pressure,
hypertension, high cholesterol, asthma, Chronic Obstructive
Pulmonary Disease, gastritis and seizures. (*Id.*). Plaintiff has
been provided continuous and appropriate treatment for these
conditions for many years. (*Id.*). With regard to his high blood
pressure, Plaintiff has received the following medications:
Doxazosin, Atenolol, Clonidine, Cardura, Hydrochlorothiazide
(HCTZ), Maxide, Tenormin and Enteric coated Aspirin. (*Id.*).
Plaintiff has received Mevacor for treatment of his elevated
cholesterol. (*Id.*). Additionally, in order to monitor his high
blood pressure, Plaintiff has been afforded a series of weekly
blood pressure evaluations designed to track his blood pressure
daily in increments of five consecutive days. (*Id.;* doc. 56, ex.
A). Plaintiff is also enrolled in Fountain's chronic care clinic
where he receives regular evaluation and treatment for his high

blood pressure and hypertension.  (*Id.*).  It is Defendants'
opinion that Plaintiff's high blood pressure and hypertension
have been and are currently well controlled.  (*Id.*).

Additionally, Plaintiff has been afforded extensive
specialty evaluation for his neurological symptoms including
sporadic tingling in his upper extremities and spotted vision.
(Doc. 56 at 2, exs. B, C, D, and E).  On June 29, 2004, Plaintiff
was admitted to Atmore Community Hospital for neurological
evaluation and was afforded a carotid duplex scan.  (*Id.*, ex. B).
Dr. Larry J. Arcement conducted the scan and determined that
Plaintiff had mild plaque formation in the right distal common
carotid artery and in both carotid bulbs.  (*Id.*).  There was no
plaque formation or stenosis evident in either the internal or
external carotid arteries.  (*Id.*).

Additionally, according to Defendants, as well as
Plaintiff's own medical records, Plaintiff was also seen by
Montgomery ophthalmologist John A. Jones, M. D., who determined
that he may have suffered from a transient amaurosis fugax, a
condition that causes temporary blurred vision as a result of
restricted blood flow to the retina.  (Doc. 56 at 2-3, ex. C).
In order to support Dr. Jones' diagnosis, Dr. Scott Loveless
evaluated Plaintiff on March 8, 2004, and performed a skull x-ray
which revealed Plaintiff had a normal skull with clear sinuses.
(*Id.* at 3, ex. D).  Further, Plaintiff was referred to Luke

Adams, M.D. of the Atmore Community Hospital for a head CT scan
on April 6, 2004, which was normal. (*Id.,* ex. E). Plaintiff's
sinuses were found to be normally pneumatized. No focal brain
parenchymal abnormality, intracranial hemorrhage, or pathologic
extra axial fluid collection was noted. (*Id.*). Later, on
October 27, 2004, Dr. Arcement performed a brain MRI on
Plaintiff. (*Id.*). The MRI covered the area from the base of the
brain to the vertex, and no infarct, intracranial bleed or mass
effect was evident. According to Defendants, Dr. Jones' initial
diagnosis of a fugax was unsupported by definitive diagnostic
evaluation. (*Id.*).

Next, Dr. Todd Elmore, a Mobile neurologist, provided
Plaintiff a neurology consultation on December 22, 2004. (Doc.
56 at 3, ex. A). He suggested that Plaintiff's neurological
symptoms may have been caused by temporal arteritis, an
inflammatory condition of the temporal arteries. Dr. Elmore
recommended that a vascular surgeon perform a temporal artery
biopsy. (*Id.*). He also recommended an MRI of the cervical
spine. The cervical spine study was completed on December 29,
2004, by Dr. Luke Adams, and that test showed that Plaintiff
suffered from degenerative disc disease with moderate to marked
narrowing of the neural foramen and compression of the thecal
sac, most significantly at C5-6 and C6-7. Plaintiff's tingling
sensation in his upper extremities is caused by this degenerative

disc disease as well as cervical arthritis.  Surgery was not recommended for correction of Plaintiff's cervical arthritis or degenerative disc disease.  *(Id.*, ex. H*)*.

On February 18, 2005, Plaintiff was referred to vascular surgeon Dr. Roy Gandy who performed a temporal artery biopsy. (Doc. 56 at 4, ex. I).  The tissue sample was evaluated by pathologist Dr. Robert M. Donnell who determined that Plaintiff was negative for arteritis.  *(Id.*, ex. J).  On December 1, 2005, petitioner was seen by ophthalmologist Dr. Joseph Gravlee who determined that Plaintiff's eyesight was degenerating due to macular degeneration and nuclear sclerosis.  *(Id.*).  Dr. Gravlee determined that Plaintiff's vision was naturally diminishing with age and that Plaintiff's level of vision cannot be improved. *(Id.*).

Dr. Barnes believes that the medical treatment, care, and evaluation provided to Plaintiff at Fountain has been appropriate and proper at all times.  Plaintiff's neurological conditions have stabilized and he is being provided appropriate care.  At all times, Dr. Barnes, Nurse Julie Gordon, and Nurse Elizabeth Dell Lee, as well as other healthcare providers at Fountain have exercised the same degree of care, skill, and diligence as other similarly situated healthcare providers would have exercised under the same or similar circumstances.  (Doc. 56 at 4; doc. 24, ex. C at 2; ex. D at 2).  Nurse Gordon specifically avers that at

13

no time has she or any of the other medical nursing staff denied
Plaintiff necessary medical care.  (Doc. 24, ex. C at 1).
Defendant Lee specifically avers that at no time did she ever
deny Plaintiff any ordered tests, treatment, or consultation.
(Doc. 24, ex. C at 2).  The Court further notes that the fact
that Plaintiff received extensive medical treatment from February
of 2004 until the present, is well supported by the record.
(Doc. 24, exs. A-D; doc. 56, exs. A-K; doc. 67, exs. A, B, B-1,
C, and C-1).

   As a result of Plaintiff's claim that he has been denied
medical care, Plaintiff is requesting that the Court issue a
declaratory judgment stating that the physical abuse of Plaintiff
by Defendants Dr. Barnes, Julie Gordon and Elizabeth Lee violated
Plaintiff's rights under the Eighth Amendment and Fourteenth
Amendment under deliberate indifference to serious medical needs
of prisoners constituting unnecessary and wanton infliction of
pain.  (Doc. 28 at 11-14).  Plaintiff is also requesting that the
Court award compensatory damages in the amount of $100,000
jointly and severally against all three Defendants for the
physical and emotional injuries sustained as a result of the
deliberate indifference to serious medical needs of prisoners
constituting unnecessary and wanton infliction of pain.  (*Id.*).

   Plaintiff is also requesting that the Court award punitive
damages in the amount of $25,000 against each Defendant for the

14

physical and emotional injuries sustained as a result of the deliberate indifference to serious medical needs of prisoners constituting unnecessary and wanton infliction of pain.  (*Id.*).

## II. SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The *Federal Rules of Civil Procedure* grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting *Fed. R. Civ. P.* 56(c)).  The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party.  *Barfield v. Brierton*, 883 F.2d 923, 934 (11th Cir. 1989).

However, Rule 56(e) states that:

> an adverse party [to a motion for summary judgment] may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*Fed. R. Civ. P.* 56(e); *see also Celotex Corp.*, 477 U.S. at

15

325-27.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).  "Summary judgment may be granted against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Liberty Mut. Fire Ins. Co. v. Sahawneh*, 2001 WL 530424, *1 (S.D. Ala. May 11, 2001) (citing *Anderson*, 477 U.S. at 249-50).

## III. DISCUSSION

In this action, Plaintiff seeks redress for an alleged constitutional deprivation pursuant to 42 U.S.C. § 1983. Specifically, Plaintiff alleges that Defendants' deliberate indifference to his serious medical needs while incarcerated at Fountain, *i.e.*, the denial of appropriate medical care for his high blood pressure, vision, and numbness in his arm from February 2004 until the time of the filing of this action, violated his rights under the Eighth Amendment.[4]  For the reasons

---

[4]Plaintiff states that he is suing Defendants in their official and individual capacities in this lawsuit.  Defendants have asserted various types of immunity, however, as private entities, Dr. Robert Barnes, Nurse Julie Gordon, and Nurse Elizabeth Dell Lee, are not entitled to immunity, whether qualified or absolute.  *See Swann v. Southern Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004) ("The parties agree that

16

set forth below, the Court finds that Plaintiff's allegations fail to establish any constitutional violation by Defendants. Thus, it is recommended that Defendants' motion for summary judgment be granted.

### Denial of Adequate Medical Care

As discussed above, in this action, Plaintiff alleges that Defendants were "deliberately indifferent" to his serious medical needs in violation of the Eighth Amendment by failing to provide proper medical treatment for him during his incarceration at Fountain Correctional Facility. (Docs. 1, 2, 25, 28, 35, 36, 43, and 61). Specifically, Plaintiff alleges that he has had serious medical problems with high blood pressure, blurred vision and numbness in his right arm and that Defendants have delayed his treatment, as well as given him inadequate medical treatment.

The Eighth Amendment provides that, "[e]xcessive bail shall

---

as a private entity, SHP [a private corporation employed by the county to provide medical care to inmates at the county jail] is not entitled to assert a qualified immunity defense."); *Hinson v. Edmond*, 205 F.3d 1264, 1265 (11th Cir. 2000) (a "privately employed prison physician [ ] is ineligible to advance the defense of qualified immunity"); *Edwards v. Alabama Dep't of Corrections*, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a "private entity" contracting with a state to provide medical services to state inmates "is not entitled to qualified immunity...."). With respect to absolute immunity, Defendants have cited no case, and the Court is aware of no case, extending absolute immunity to privately employed medical companies or privately employed physicians and nurses providing medical services to state inmates.

not be required, nor excessive fines imposed, nor cruel and

unusual punishments inflicted." U.S. Const. amend. VIII. "The

Eighth Amendment's proscription of cruel and unusual punishments

prohibits prison officials from exhibiting deliberate

indifference to prisoners' serious medical needs." *Campbell v.*

*Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing *Estelle v.*

*Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251

(1976)). In *Sims v. Mashburn*, 25 F.3d 980 (11th Cir. 1994), the

Court delineated the objective and subjective portions of an

Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two
> components, an objective component, which
> inquires whether the alleged wrongdoing was
> objectively harmful enough to establish a
> constitutional violation, and a subjective
> component, which inquires whether the
> officials acted with a sufficiently culpable
> state of mind.

25 F.3d at 983.

To meet the objective element required to demonstrate a

denial of medical care in violation of the Eighth Amendment, a

Plaintiff must first demonstrate the existence of an "objectively

serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th

Cir. 2003). "Because society does not expect that prisoners will

have unqualified access to health care, deliberate indifference

to medical needs amounts to an Eighth Amendment violation only if

those needs are 'serious.'" *Hill v. DeKalb Reg'l Youth Det. Ctr.*,

40 F.3d 1176, 1186 (11th Cir. 1994) (quoting *Hudson v. McMillian*,

18

503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992)).

"[A] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 1187 (quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977)).   As noted by the Ninth Circuit, "[a] 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (quoting *Estelle*, 429 U.S. at 104, 97 S. Ct. at 291)(overruled on other grounds by *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997)).

In order to meet the required subjective element of an Eighth Amendment denial of medical care claim, a Plaintiff must demonstrate "deliberate indifference" to a serious medical need. *Farrow,* 320 F.3d at 1243.

> In *Estelle*, the Supreme Court established that "deliberate indifference" entails more than mere negligence.  *Estelle,* 429 U.S. at 106, 97 S. Ct. 285; *Farmer,* 511 U.S. at 835, 114 S. Ct. 1970.  The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also

> draw the inference." *Farmer,* 511 U.S. at
> 837, 114 S. Ct. 1970 (emphasis added).  In
> interpreting *Farmer* and *Estelle,* this Court
> explained in *McElligott* that "deliberate
> indifference has three components: (1)
> subjective knowledge of a risk of serious
> harm; (2) disregard of that risk; (3) by
> conduct that is more than mere negligence."
> *McElligott,* 182 F.3d at 1255; *Taylor,* 221
> F.3d at 1258 (stating that defendant must
> have subjective awareness of an "objectively
> serious need" and that his response must
> constitute "an objectively insufficient
> response to that need").

*Farrow*, 320 F.3d at 1245-46 (emphasis in original).

For purposes of this analysis, the Court assumes, without deciding, that Plaintiff has demonstrated an "objectively serious medical need" in order to satisfy the first component of his Eighth Amendment claim.  The Court turns its focus, instead, to Plaintiff's claim that Defendants were deliberately indifferent to his serious medical need for treatment for his health problems.

Plaintiff maintains that he has suffered from high blood pressure, numbness in his right arm, and severe vision problems that have been inadequately treated by Defendants since February 2004.  Plaintiff's medical records reflect a history of chronic high blood pressure and asthma for a number of years, as well as vision and right arm numbness problems beginning in February of 2004.  (Doc. 24, ex. A). However, Plaintiff's medical records also reflect extensive, ongoing treatment with Defendant Dr. Barnes, as well as medical specialists in Mobile, Atmore, and

Montgomery, for those problems.

With respect to Plaintiff's right arm numbness and vision problems, his records reflect that he first experienced loss of vision on February 20, 2004.  Initially, he was examined on March 1, 2004, by Montgomery ophthalmologist, Dr. John A. Jones, who determined that Plaintiff may have suffered from a transient amaurosis fugax, a condition that causes temporary blurred vision as a result of restricted blood flow to the retina.  (Doc. 56, ex. C).  In order to further explore Dr. Jones' diagnosis, Dr. Scott B. Loveless evaluated Plaintiff on March 8, 2004, and performed a skull x-ray.  (Doc. 58, ex. D).  However, this x-ray indicated that Plaintiff had a normal skull with clear sinuses. Plaintiff was then referred to Dr. Luke Adams at the Atmore Community Hospital for a head CT scan on April 6, 2004, which was also normal.  (Doc. 58, ex. E).  Subsequently, on October 27, 2004, Dr. Larry J. Arcement performed a brain MRI on Plaintiff, finding no infarct, intracranial bleed or mass effect.  (*Id.*). Thus, Dr. Jones' initial diagnosis of a fugax was unsupported by definitive diagnostic evaluation.

Plaintiff next saw Dr. Todd Elmore, a Mobile neurologist, in December of 2004 for further treatment of Plaintiff's neurological problems.  (Doc. 67, ex. A; doc. 58, ex. G).  Dr. Elmore suggested that Plaintiff's problems might have been caused by temporal arteritis, and recommended that a vascular surgeon

perform a temporal artery biopsy and an MRI of the cervical spine.  (Doc. 56, ex. A).  Dr. Elmore also prescribed the drug Prednisone.[5]  The cervical spine study was completed on December 29, 2004, by Dr. Luke Adams and the study revealed that Plaintiff suffered from degenerative disc disease with moderate to marked narrowing of the neural foramen and compression of the thecal sac, most significantly at C5-6 and C6-7.  (Doc. 56, ex. H). Surgery was not indicated for correction of Plaintiff's cervical arthritis or degenerative disc disease.  (*Id.*)

Thereafter, on February 18, 2005, Plaintiff was referred to vascular surgeon Dr. Roy Gandy, who performed the temporal artery biopsy.  (Doc. 56, ex. I).  The tissue sample was then evaluated by pathologist Dr. Robert M. Donnell, who determined that Plaintiff was negative for arteritis.  (Doc. 56, ex. J).

On December 1, 2005, ophthalmologist Dr. Joseph F. Gravlee examined Plaintiff and determined that Plaintiff's eyesight was degenerating due to macular degeneration and nuclear sclerosis. He also determined that Plaintiff's eyesight was naturally diminishing with age, and that his vision could not be improved. (*Id.*).

With respect to Plaintiff's blood pressure problems, his medical records reveal that he has been regularly treated in the

---

[5]Plaintiff was later weaned off of Prednisone by Dr. Barnes, when it became apparent that Plaintiff was negative for arteritis.  (Doc. 67, ex. A).

Chronic Care program at Fountain, with numerous blood pressure
checks dating back to, at least, 2002.  (Doc. 24, ex. A).
Plaintiff's medical records indicate that he has been
administered numerous medications for the improvement of this
condition, including Doxazosin, Atenolol, Clonidine, Cardura,
Hydrochlorothiazide (HCTZ), Maxide, Tenormin and Enteric coated
Aspirin.  (Doc. 56 at 2).  According to his records, although
Plaintiff has been prescribed appropriate medication, he has not
always taken his medication as he was directed.  (Doc. 24, Ex. A
at 78).  The records further show that at various times,
Plaintiff has been  monitored for hours in the medical ward at
Fountain for treatment of his high blood pressure.[6]  (Doc. 24,
ex. A at 79).

Having considered the evidence in this action in the light
most favorable to Plaintiff, the Court finds that Plaintiff has
failed to establish an Eighth Amendment violation by these
Defendants.  As discussed above, in order to satisfy the
subjective element of an Eighth Amendment claim, Plaintiff must
show that Defendants knew of and disregarded "an excessive risk

---

[6]Plaintiff now contends that he is allergic to his blood
pressure medication Catapres.  However, a review of Plaintiff's
medical records reveals no complaint by Plaintiff of any negative
side effect or reaction to this drug.  In fact, on April 23,
2004, Plaintiff advised the medical staff that he needed his
blood pressure checked, and that he had been feeling bad.  He
stated that "[e]verytime I get a catapres[s] it lowers it."
(Doc. 24, ex. A at 80).  Plaintiff also requested a Catapres on
May 12, 2003, for control of his blood pressure.  (*Id.* at 90).

to [his] health or safety." *Farrow*, 320 F.3d at 1245.   Stated differently, Plaintiff must show that Defendants had "subjective knowledge of a risk of serious harm," that Defendants disregarded that risk, and that Defendants did so "by conduct that is more than mere negligence." *Id.*   The record here is devoid of evidence that Defendants had subjective knowledge of, and disregarded, a risk of serious harm to Plaintiff from his vision, blood pressure, or numbness problems.   To the contrary, the record shows that with respect to Plaintiff's right arm numbness and vision problems, Dr. Barnes and the other prison medical staff, as well as other private medical specialists were perplexed by Plaintiff's condition and yet they constantly monitored and treated Plaintiff with medications, specialist evaluations, and diagnostic procedures from the date of his initial complaint of vision problems in February 2004, until the present.   There is no evidence that Defendants were deliberately indifferent to this, or any of his medical problems, or that they ever stopped trying to improve his condition.   Indeed, Dr. Barnes regularly and consistently treated Plaintiff's high blood pressure through various medications and extensive evaluations.

The Eleventh Circuit has recognized that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989).   The fact that a Plaintiff may disagree

with the efficacy of the treatment recommended or simply prefer a different course of treatment does not state a valid claim of medical mistreatment under the Eighth Amendment. *See*, *e.g.*, *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) ("the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment.") (quoting *Estelle*, 429 U.S. at 107); *Del Muro v. Federal Bureau of Prisons*, 2004 WL 1542216, *4 (N.D. Tex. 2004) (unpublished) ("[i]t is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does not state a claim for deliberate indifference to medical needs.").

Moreover, it is well established that "[s]imple medical malpractice . . . does not rise to the level of a constitutional violation." *Waldrop*, 871 F.2d at 1035. Thus, even if the Court were to assume that, at times, Plaintiff had been incorrectly diagnosed and/or treated by Dr. Barnes or the other prison medical staff, of which there is no evidence, Eighth Amendment liability cannot be grounded on "mere negligence." *Farrow*, 320 F.3d at 1245. While the Court recognizes that Plaintiff experienced chronic blood pressure problems, numbness, and

25

serious vision problems for a period of months, there is no evidence that Defendants refused to treat him or that they engaged in "deliberately indifferent" delay in treating any of these medical problems.

Inasmuch as Plaintiff's own medical records establish that he received extensive medical treatment for his right arm numbness and vision problems and high blood pressure, Plaintiff has failed to meet the subjective element of "deliberate indifference" necessary to constitute an Eighth Amendment violation.  Thus, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.

## V.   CONCLUSION

Based on the foregoing, it is recommended that the motion for summary judgment of Defendants, Dr. Robert Barnes, Julie Gordon, and Elizabeth Lee, be granted and that Plaintiff's action against these Defendants be dismissed with prejudice.

### MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.   Objection.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.    <u>Transcript (applicable where proceedings tape recorded)</u>. Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 7th day of July, 2006.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE